Dr. John R. Sharp, Appellee, v. John Brown, Appellant.

Gen. No. 9,740.

Opinion filed March 7, 1951. Rehearing denied April 20, 1951. Released for publication April 20, 1951.

GILLESPIE, BURKE & GILLESPIE, of Springfield, and RINAKER, SMITH & HEBRON, of Carlinville, for appellant.

SNELL & SEYFRIT, and HEMPHILL & KELSEY, both of Carlinville, for appellee.

MR. JUSTICE WHEAT delivered the opinion of the court.

This is an action for personal injuries in which the jury returned a verdict in the sum of $17,000 in favor of plaintiff appellee Dr. John R. Sharp, against defendant appellant John Brown. Upon denial of motions for judgment notwithstanding the verdict and for new trial, judgment was entered upon the verdict and this appeal follows.

The complaint as amended charged substantially that on October 18, 1948, at about 2 p.m. plaintiff, in the exercise of due care, was driving his automobile in a northerly direction about one and one-half miles southeast of Girard, Illinois; that defendant by his agent Fabian Seelbach, was then driving his automobile in an easterly direction upon an intersecting highway; that a collision resulted by reason of the negligence of the defendant in driving his car at a speed which was greater than was reasonable and proper having regard for the traffic and use of the way, in failing to yield the right of way to a car approaching from the right, and in failing to keep a proper lookout.

No question is raised as to the giving or refusing of instructions, or as to the amount of the verdict, but solely that plaintiff did not prove that he was in the

24

exercise of due care. Plaintiff was accompanied by one Ralph C. Everhart; Seelbach was alone; none of the three could recall any of the circumstances of the collision by reason of injuries, and there were no other eyewitnesses. It is urged that the circumstantial evidence does not show that plaintiff was in the exercise of due care.

The collective testimony of the witnesses as to the physical conditions relating to the scene of the collision, is vague, confusing and indefinite, but it is from this and the photographs in evidence, that the question of due care of the plaintiff must be determined. No plat was offered in evidence to aid the court and jury, but as to the intersection itself, the most authoritative testimony seems to be that of William Yowell who had been the County Superintendent of Highways for over eighteen years. From his testimony it appears that the road extending east and west was thirty-five feet wide west of the intersection from fence to fence; the width from shoulder to shoulder was twenty feet of which the middle twelve feet was oiled; that the road extending north and south was forty feet wide south of the intersection, from fence to fence, of which the middle sixteen feet was oiled; that concrete headers (being 3 to 6 inches above the surface of the road) lessened the roadway width to eighteen feet. It is not clearly set forth, but it seems that a ditch extended along the east side of the north and south road for drainage purposes and that a culvert extended north and south under the east side of the intersection; that concrete headers seventeen feet apart extended above the north and south ends of the culvert. (It is probable that subsequent witnesses referred to this culvert in mentioning a "bridge.") From the testimony of other witnesses it appears that the day was bright, clear and dry; that the surrounding terrain was generally flat; that the farm land southwest of the intersection was in

25

pasture and had no trees or structures on the same; that the pasture extended west along the east and west road for a distance of about 400 feet, and south along the north and south road for a distance of about 500 feet. The photographs in evidence tend to corroborate many of the above statements, and in particular to indicate that each driver had a practically unobstructed and equal view of the other from points considerably distant from the intersection.

The material testimony of the witness Delos Six was that he reached the collision scene from the west shortly after the accident; that Dr. Sharp was in a ditch at the northeast corner of the intersection; nearby was Everhart; the Sharp car was on the south side of the road headed south; it was east of the concrete wing at the southeast corner, halfway in a ditch and three or four feet from a fence; the Brown car was at the northeast corner of the intersection, headed east into a hedge along the fence line, six feet northeast of the concrete wing at the northeast corner of the intersection. The witness Shane testified that he was a funeral director and drove his ambulance to the scene of the collision; that both Sharp and Everhart were lying on the north end of a bridge on the north side of the highway in a ditch; the Sharp car was on the south side of the road south of a bridge; the Brown car was at the northeast corner of the intersection. Plaintiff's witness Whitworth drove his wrecker to the scene and arrived when the ambulance was about to leave; Sharp was in the ambulance but Everhart was lying in a ditch about four feet deep and was six or eight feet north of the north cement abutment on the east side of the road; the Sharp car was about ten feet east of the south end of the bridge with the front end headed south and in a ditch about three feet deep; the other car was north of the bridge about twenty feet beyond Everhart; it had crossed a ditch on the east side of the road and

26

headed into a hedge; the Sharp car was damaged all over but mostly on the left side beginning with the left front wheel; the glass in the left door was broken from the inside and had blood on it; tire tracks led from the Sharp car to the bridge (this in response to a question as to whether the marks extended to the north end of the bridge); there were paint marks on the bridge and a pipe railing was knocked off of the abutment; the bumper of the Brown car was driven back at least eight inches on the right side; there was a "sharp cut" in the pavement west of the Sharp car, west of and at the north end of the abutment beginning at the center of the east and west road and extending northeasterly in a curve or arc; loose dirt which appeared to have fallen recently was in an area about six feet in diameter in the southeast part of the intersection, the north edge of the dirt as to the east and west road was at the center line or over, "some place in there." On cross-examination he stated that the sharp mark started almost in the center of the east and west road and east of the center line of the north and south road; the bumper of the Brown car pushed dirt before it like a bulldozer cornerwise into a hedge. The witness Perrine stated that when he arrived at the scene of the accident, Everhart was lying by an abutment and Sharp was lying six feet from one ditch and twelve feet from another, and twelve feet from an abutment. The witness Tipton testified that he went to the scene two days after the event and took some pictures; he placed a package of cigarettes somewhere in the intersection and stated that such package marked the beginning of a mark leading to the northeast, to the north of the culvert and into the bank; after the car hit the ditch there was no mark, but across the ditch against the hedge was another mark which looked like a bulldozer had run into the bank. The witness failed to state wherein, in the intersection, he placed

27

the package of cigarettes and such cannot be determined from the photographs. The witness Stutsman stated that he went to the accident scene after hearing a crash which made as much noise as "a couple of box-cars coming together"; Seelbach was staggering into the road; the Brown car was at the northeast corner of the intersection in a ditch between three and five feet deep; the front end had crossed a ditch and had run into the bank; it was about twenty-five or thirty feet northeast from the center of the intersection; the other car was on the south side of the east and west road headed southeast into a ditch and into a bank; both Sharp and Everhart were "dead" and were in the ditch on the north side of the east and west road; there was an iron railing on the abutment on the south side of the road, but there was none on the north abutment as it had been broken off sometime. On cross-examination he stated that he pulled Sharp out of the water so that both Sharp and Everhart were lying close together. The witness Buchanan testified that he was a state policeman; that he reached the accident scene about two hours after the occurrence; the Brown car was on the east side of the road about twenty feet north of the intersection; the front end had dug into a bank; he saw marks from the west of the intersection which extended northeasterly to a small ditch "almost approximately eight or ten inches high"; the mark started south of the geographical center of the intersection, approximately half of the width of the east-west road.

On behalf of the defendant, the witness Fox testified that he was working with the witness Stutsman when he heard the noise of the collision and went to the scene; the tracks of the Sharp car "coming from the south and it turned and went a little to the west of the road there, almost to the south end of the bridge and circled around towards the east"; it stopped in a ditch

28

on the south side of the east and west road east of the bridge. The witness Boston stated that he saw Seelbach in a dazed condition; that he saw tracks made by the north bound car which made a sharp turn to the right and crossed near the north abutment, apparently the impression of a rim into an arc about three or four feet, and the car finally headed into a ditch on the south side of the road. The defendant Brown testified that when he arrived at the collision scene Sharp was gone but Everhart was still there; the Brown car was headed in a northeasterly direction and about eight or ten feet north of the wing of the abutment on the east and west road; the bumper had crossed the ditch and had hit the hedge.

 ▪ It is well established that a plaintiff in a negligence case must allege and prove due care on his part. (*Dee v. City of Peru,* 343 Ill. 36; *Ames v. Terminal R. R. Ass'n of St. Louis,* 332 Ill. App. 187.) In the instant case the plaintiff had no recollection as to the occurrence, although upon being recalled as a witness he stated, as to speed, that while driving north at an unstated distance from the intersection: "I imagine it was somewhere between thirty and thirty-five miles an hour." Obviously in view of the circumstances and the vagueness of this testimony it was entitled to little weight. His guest Everhart and the defendant's agent Seelbach likewise had no recollection as to the accident. A consideration of the question of plaintiff's due care thus depends upon circumstantial evidence, as adduced by the oral testimony and the photographs. It is pertinent to keep in mind that as plaintiff proceeded north, it was necessary for his car to pass between concrete structures eighteen feet apart located south of the east and west road, and that as Seelbach proceeded east it was necessary for his car to pass between concrete structures seventeen feet apart located east of the north and south road. For practical driving purposes

29

the intersection thus was a rectangle measuring seventeen feet north and south and eighteen feet east and west. The southeast quarter of this intersection would therefore be an area nine feet by eight and one-half feet, not quite a car length in either direction. Consideration must also be given to the fact that each driver had an unobstructed view of the other's car for a distance of 400 to 500 feet from the intersection. Unquestionably the cars collided somewhere in the intersection, caromed from each other, causing plaintiff's car to swerve in an arc to its right, the northeast, during which it struck the north abutment of the culvert at the northeast corner and then went south into a ditch at the southeast corner. The plaintiff and Everhart were thrown from the car into the ditch at the northeast corner. Defendant's car was deflected to the northeast, crossed a ditch on the east side of the highway north of the north abutment, and ran against a hedge on the east side of the ditch. The photographs of the two cars are not very helpful, for although they indicate the damage to the two cars, it cannot be determined whether such was caused by the original impact or by the subsequent gyrations. The court has attempted to analyze all of the evidence to indicate the state of confusion and vagueness of the evidence on the question of due care of the plaintiff. It does not appear as to just where in the intersection the collision occurred, or as to which driver had the right of way. Plaintiff cannot argue that he has made out a prima facie case of due care solely because he approached the intersection from the right. This is not an absolute rule but one variated by conditions of speed and distance so that its application must be predicated upon the facts in each case. The driver of a vehicle approaching an intersection from the right, cannot, as a matter of law, proceed upon the conclusive presumption that a vehicle approaching from his left will yield the right of way. (*Kirchoff v. Van Scoy,* 301 Ill. App. 366.) With

the record in this condition, it cannot be said that the preponderance of the evidence indicates that plaintiff was in the exercise of due care, or that the verdict was not against the manifest weight of the evidence as to this issue.

The judgment of the circuit court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*